UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                                                 :

THE CIT GROUP/EQUIPMENT FINANCING,  :
INC. d/b/a/ TOSHIBA AMERICAN MEDICAL  :
CREDIT,                                              :          09 Civ. 409 (JPO)
                                Plaintiff,     :
                                                :                <u>ORDER</u>
              -against-                        :
                                                  :
GEORGE C. SHAPIRO, MD, et al.,              :
                                 Defendants.  :
                                                  :
--------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

## I. Introduction

The parties to this case have filed cross-motions for summary judgment. For the reasons that follow, Plaintiff's motion is granted, Defendants' motion is denied, and Plaintiff's damages are limited to $606,063.84.

## II. Discussion[1]

### A. Standard of Review: Summary Judgment

Summary judgment is appropriate where the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Vacold, L.L.C. v. Cerami*, 545 F.3d 114, 120-21 (2d Cir. 2008). The moving party bears the burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must resolve all ambiguities and draw all permissible

---

[1] Familiarity with the factual background of this case is assumed. The Court relies upon undisputed facts, or facts as to which there is no *genuine* dispute, unless otherwise noted.

1

inferences in favor of the non-moving party.  *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).  Here, the parties agree on virtually all material facts and the dispute primarily involves questions of law.  Where an alleged factual dispute is relevant, it is noted and addressed under the ordinary summary judgment standard of review.

    B.   **Defendants Breached the Master Lease and Guaranty Contracts**

  Under Arizona Law, which governs the 2005 Master Lease, "[t]o establish a contract claim, a plaintiff must show a contract, a breach of contract, and damages.  *Konrath v. Amphitheater Unified Sch. Dist. No. 10*, No. 04 Civ. 179, 2007 WL 2809026, at *26 (D. Ariz. Sept. 26, 2007) (citing *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975)).  "Where the language of the contract is clear and unambiguous, it must be given effect as it is written."  *Hadley v. Sw. Properties, Inc.*, 116 Ariz. 503, 506, 570 P.2d 190, 193 (1977).

  Here, it is not disputed that Plaintiff and Defendants entered into contracts.  The Shapiro Corporation entered into a contract with Plaintiff when it signed the Master Lease in 2005.  The Shapiros entered into a contract with Plaintiff when they signed the Guaranty in 2005, personally and unconditionally guaranteeing the Shapiro Corporation's payment and other obligations under the Master Lease.  In the 2007 Assignment, the Shapiro Corporation assigned its interest in the Scanner to Capitol, but under the clear terms of the Assignment, the Master Lease remained in full force and effect.  Both of the defendants thus entered into contracts with Plaintiff.

  Defendants breached these contracts.  The relevant facts are not in dispute.  When Capitol stopped making payments as of August 28, 2008, the Shapiro Corporation incurred an obligation under the still-operative Master Lease to pay amounts due and owing.  The Shapiro Corporation did not make any such payments at the time, nor has it made any payments since this litigation commenced.  Because of the Guaranty, the Shapiros were personally obliged to pay amounts due

and owing if and when the Shapiro Corporation failed to do so.  The Shapiros have made no such payments.  Thus, there is no dispute that Defendants have not made any payment on obligations arising from Capitol's inability to satisfy its obligations under the Assignment.  As a direct result of this non-payment, Plaintiff has sustained damages arising from the breach of contract.

For these reasons, unless Defendants can prove that Plaintiff violated the contracts or that the contracts are for some other reason non-binding, Plaintiff deserves summary judgment.

### C.      Plaintiff Did Not Breach Either of the Contracts

Defendants offer a grab-bag of arguments designed to defeat Plaintiff's straightforward breach of contract claim.  Defendants' main argument is that they never defaulted because Plaintiff failed to provide notice of amounts due and owing after Capitol ceased making payments and, later, filed for bankruptcy protection.  Because the parties agree that Plaintiff did not provide notice, the critical question is whether Defendants were entitled to notice.  The plain language of the contract cuts squarely against this hypothesized notice requirement.  It provides, in pertinent part, that upon default, Plaintiff was entitled to "without notice or further action . . . declare immediately due and payable (i) all Rent Payments due under the Lease, (ii) as liquidated damages . . . the Stipulated Loss Value for the Equipment."  Jt. Ex. A. § 15.1(e).  Defendants advance five grounds to support their position that, notwithstanding this language, the relevant contracts did, in fact, require notice.  None of these arguments succeeds.

First, Defendants argue that Plaintiff, by its conduct, waived the right to timely payment and the no-notice provisions in the contract.  *See AGA Shareholders, LLC v. CSK Auto, Inc.*, 589 F. Supp. 2d 1175, 1184-85 (D. Ariz. 2008) ("Conduct inconsistent with demanding strict compliance with the contract [ ] results in a waiver of the . . . contract provisions." (internal quotation marks and citations omitted)).  This waiver allegedly occurred when Plaintiff, on a few

occasions, afforded notice and opportunities to cure when the Shapiro Corporation had been up to ten days late in payments. Defendants add that Plaintiff made a practice of sending invoices before rental payments were due and providing notice of default. In Defendants' view, this course of conduct constituted waiver of the Master Lease's no-notice and timely payment provisions.

This argument runs aground on the contractual text, which provides that "waiver by Lessor of any breach of any Obligation of Lessee shall not be deemed a waiver of any future breach of the same or any other Obligation." Jt. Ex. A at § 15.3; *see also* 2005 Unconditional Guaranty, Jt. Ex. E, at § 4 ("No Guarantor shall be released or discharged, either in whole or in part, by [Plaintiff's] failure to enforce this Guaranty [r] any other Transactions Documents [including the Lease] . . ."). Alternatively, Defendants' argument fails because, despite knowledge of the default since at least January 2009, Defendants have made no effort to cure the default or request a reasonable time to bring payments up to date. Even to the extent that Plaintiff waived strict enforcement of the no notice and timely payment provisions, that wavier does not persist indefinitely or forever undermine Plaintiff's right to collect funds due and owing.

Second, Defendants argue that the Master Lease's no notice provisions must be invalid on grounds of substantive and procedural unconscionability. *See Maxwell v. Fid. Fin. Services, Inc.*, 184 Ariz. 82, 90 (1995) (discussing unconscionability doctrine under Arizona state contract law). The core of this argument is that the Master Lease deprived Defendants of any mechanism for determining their obligations in the event of a default by Capitol. This argument is not persuasive. Article 2A of the Uniform Commercial Code, which has been adopted in Arizona, expressly provides that "[e]xcept as otherwise provided in this Article or the lease agreement, the

lessor or lessee in default under the lease contract is not entitled to notice of default or notice of enforcement from the other party to the lease agreement." UCC §2A-502. The default rule set by the U.C.C. is presumptively not unconscionable. Further, Defendants are simply incorrect. Defendants could easily have contracted with Capitol, or developed some other informal arrangement, to monitor their obligations under the Assignment, Master Lease, and Guaranty. Moreover, Defendants have been on notice for at least three years and still have not made any payments to Plaintiff on amounts due and owing pursuant to the Master Lease. Finally, Defendants are sophisticated parties and there was no significant disparity of bargaining power.

Third, the Shapiro Corporation identifies a purported question of fact regarding when its obligations under the Assignment were triggered. This argument misses the point. The Master Lease remained in operation even after the parties agreed to the Assignment. Obligations to pay Plaintiff were never "triggered." They persisted all along, notwithstanding the fact that Capitol made these payments for a period of time. There is no question of fact here.

Fourth, Defendants identify a purported question of fact regarding application of the doctrine of equitable estoppel to Plaintiff's insistence on compliance with the Master Lease's no notice provision. *See Valencia Energy Co. v. Arizona Dept. of Revenue*, 191 Ariz. 565, 576-77 (1998) ("The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation of its prior conduct."). This argument is derivative of Defendants' first argument and rests, in large part, on the claim that Plaintiff, through its course of conduct, advanced an inconsistent position regarding its view of strict adherence to the no notice and timely payment provisions. Largely for the reasons noted above, this argument does not succeed. Further, "[t]he doctrine of equitable estoppel is not

applicable unless one is injured by justifiably relying upon conduct of another intended to induce such reliance." *Villas at Hidden Lakes Condominiums Ass'n v. Geupel Const. Co., Inc.*, 174 Ariz. 72, 78 (Ct. App. 1992).  Here, there is no allegation of intent to induce reliance—nor would it have been justified as a matter of law for Defendants to rely on Plaintiff's actions, which consisted of sending invoices, sending notice of default, and allowing a ten-day window to cure default in a few exceptional cases, to conclude that a notice requirement applied.  This is particularly true where the contractual language expressly included both a no notice provision and a provision disowning waiver in the event of occasional departures.

Finally, Plaintiff invokes the law of secured transactions, noting that the Master Lease gave the Shapiro Corporation an option to purchase the equipment at the end of the lease period. That bare fact, however, does not create a security interest under Arizona state law.  Ariz. Rev. Stat. Ann. §47-1203(C)(4-5) ("A transaction in the form of a lease does not create a security interest merely because . . . [t]he lessee has an option to renew the lease or to become the owner of the goods . . . [or] [t]he lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed.").

Defendants have advanced these arguments in opposition to Plaintiff's motion for summary judgment and in support of their own motion for summary judgment.  As a matter of law, and based on undisputed facts, these arguments do not succeed for purposes of either motion.

In the alternative, and once again in opposition to Plaintiff's motion for summary judgment and in support of their own motion for summary judgment, Defendants argue that they were excused from performance of the Master Lease because Plaintiff breached it first.  *See*

*Murphy Farrell Dev., LLLP v. Sourant*, 229 Ariz. 124, 133 (Ct. App. 2012), *as amended* (June 29, 2012) ("[A]n uncured material breach of contract relieves the non-breaching party from the duty to perform and can discharge that party from the contract." (citation omitted)).  Specifically, Defendants points to three grounds for a finding of breach by Plaintiff: (1) Plaintiff unilaterally terminated the lease; (2) Plaintiff deprived the Shapiro Corporation of the right to the use and possession of the Equipment; and (3) Plaintiff repossessed and disposed of the Equipment without the consent of the Shapiro Corporation and without making them a party to, or even noticing them of, the legal proceeding used to repossess the Equipment.

      Defendants' arguments that Plaintiff breached the contract by terminating the Master Lease without notice and without affording a right to cure fail because, as explained above, the Master Lease did not require either notice or an opportunity to cure.  For that reason, Plaintiff did not breach the contract by repossessing the Equipment, since the Master Lease provided that the Shapiro Corporation's right of quiet enjoyment and use of the Equipment was contingent upon no event of default occurring.  (*See* 2005 Master Lease at ¶ 1.4.)  Here, an event of default occurred in 2008.  By the time Plaintiff repossessed the Equipment in 2009, the Shapiro Corporation no longer enjoyed any rights to its continued use under the Master Lease. Nor did Plaintiff breach the Master Lease through its manner of repossession.  The Master Lease expressly authorized repossession by consent or legal process.  Here, Plaintiff relied on legal process:  to wit, the Capitol Bankruptcy proceedings.  No provision of the Master Lease required that Defendants be joined as parties to any legal proceeding relied upon for repossession.

      Thus, looking to undisputed facts and the Master Lease's plain language, Defendants' argument that Plaintiff breached the contract first and thereby excused Defendants from their duty to perform fails as a matter of law in both of the pending motions for summary judgment.

Finally, Defendants argue that summary judgment is inappropriate because a factual dispute exists regarding the commercial reasonableness of Plaintiff's sale of the Equipment. In response to this argument, Plaintiff has stipulated in its motion papers and in a phone conference to a valuation of the Equipment at $617,930 (the value urged by Defendants). The Court holds Plaintiff to that stipulation and concludes that there is no disputed issue of material facts with respect to the commercial reasonableness of the sale of the Equipment.

To summarize, Plaintiff was not obliged to provide notice to Defendants of amounts due and owing, did not breach the contract through unilateral termination, did not breach the contract through its decision to repossess and its method of doing so, and has stipulated to facts that moot any factual dispute over the commercial reasonableness of its sale of the Equipment. Because Plaintiff did not, in fact, breach the contracts, this argument is no obstacle to a grant of summary judgment for Plaintiff—nor does it justify summary judgment for Defendants.[2]

---

[2] For these reasons, Plaintiff is hereby awarded summary judgment on Defendants' counterclaims for breach of contract, failure to file notice of the disposition of the collateral, and unconscionability. Summary judgment is also granted to Plaintiff on Defendants' counterclaims for fraud in the inducement and consumer fraud. Fraud in the inducement is a nine-element claim under Arizona law. *See Stirling Bridge, L.L.C. v. Cementos de Amigos, L.L.C.*, 1 CA-CV 06-0103, 2007 WL 5439748, at *5 n.11 (Ariz. Ct. App. July 12, 2007) ("(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the right to rely on it; (9) his consequent and proximate injury." (citation omitted)). Here, Defendants are missing a critical element: a false representation. They offer only conclusory assertions to support their allegations, referring to false statements by *Capitol*, not Plaintiff, and then referring vaguely (and without documentary evidence) to a suggestion that Toshiba was somehow complicit in this representation by virtue of an alleged—but undocumented and unpursued—offer to modify the Guaranty. Given the Court's duty to search the record on a motion for summary judgment, these self-serving, undocumented statements do not suffice to support fraud in the inducement. Defendants also allege a counterclaim under the Arizona Consumer Fraud Act, A.R.S. §44-1522. In Arizona, consumer fraud is "a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz.

Having concluded as a matter of law and on the basis of undisputed facts that Defendants *did* breach the Master Lease and Guaranty, and Plaintiff did *not* breach these contracts, the Court denies Defendants' motion for summary judgment and grants Plaintiff's motion for summary judgment with respect to liability.  The sole remaining question is whether summary judgment for Plaintiff is appropriate on the matter of damages.

### D.     Damages

Defendants argue that, under the Master Lease, they are entitled to damages for all unpaid rent payments, late charges and property taxes, the Stipulated Loss Value of the Equipment (SLV), and attorneys' fees and costs arising from CIT's enforcement of its rights under the Master Lease.  Setting aside attorneys' fees and costs, which the Court will address only after this action concludes, Defendants must show at this summary judgment stage that there are no genuine disputes of material fact regarding the damages award.

Section 15.1(e) of the Master Lease provides as follows with respect to remedies:

> [Upon the occurrence of an Event of Default, Lessor may, at its option, do one or more of the following] . . . without notice or further action on the part of Lessor, declare immediately due and payable (i) all Rent Payments due under the Lease; (ii) as liquidated damages for loss of the bargain and not as a penalty, an amount ("Liquidated Damages Amount") equal to the Stipulated Loss Value for the Equipment as of the Rent Payment Date immediately preceding the date Lessor declares or Lessee knows of an Event of Lessee; (iii) all costs and expenses incurred by Lessor in the repossession, recovery, storage or repair of the Equipment and all court costs and reasonable attorneys' fees incurred by Lessor relating to the enforcement of its rights under

---

1992).  Here, Defendants offer no evidence of any false promise or misrepresentation made by Plaintiff; rather, Defendants refer vaguely to their prior, insufficient arguments about unconscionability as a basis for finding consumer fraud.  Absent a false promise or misrepresentation, this claim fails.  In the alternative, the Court might well reject this claim on the ground that this sort of transaction is not encompassed within the language or purpose of a statute aimed at ordinary consumer-merchant interactions.

> the applicable Lease(s); and (iv) any indemnity payment, if then determinable, provided, however, that if Lessor completes a cash sale of the Equipment and delivery thereof to the buyer(s) within six (6) months of the payment in full by Lessee of the Liquidated Damages Amount and other amounts payable by Lessee under clauses (i), (ii), (iii) and (iv) above, Lessor shall reimburse Lessee the amount equal to the excess, if any, of such Liquidated Damage Amount payment plus other accounts payable by Lessee under clause (i), (iii) and (iv) above over the sum of (ii) the actual net cash proceeds of such sale(s) and [] the fair market residual value of such equipment as determined by Lessor as of the expiration or cancellation of the Basic Terms or the prevailing Renewal Term at the date of such Event of Default, as applicable. If the Event of Default described in either Section 14(c) or 13(d) above shall have occurred and is continuing, then all of the aforesaid amounts payable by Lessee shall automatically and immediately become due and payable, without presentment, demand, notice, declaration, protest or other requirements of any kind, all of which are expressly waived by Lessee.

The parties do not dispute that this provision governs the remedies available in this case. The Master Lease also contains a severability provision at Section 27.1:

> If any provision of any Lease Document, including, without limitation, this Master Lease is contrary to, prohibited by or deemed invalid or unenforceable under applicable laws, rules or regulations of any jurisdiction, such provision shall be inapplicable and deemed omitted only to the extent it is invalid or unenforceable, but shall not invalidate or otherwise affect the remaining provisions of such Lease Documents.

Because the Court concludes that Section 15.1(e) is substantively unconscionable, it relies upon this severability provision to ascertain appropriate damages.

### 1. Damages Sought by Plaintiff

Plaintiff argues that it is owed $1,225,580.61 as the unpaid balance on the Master Lease, a figure composed of $1,116,782.03 in unpaid rent, $18,965.86 in late charges, and $39,832.72

in property taxes.[3] Plaintiff adds to this figure a liquidated damages remedy in the amount of $606,063.84, representing the difference between the amount owed pursuant to a stipulated loss value schedule ($1,223,993.84) and the stipulated-to proceeds of a commercially reasonable sale of the Equipment ($617,930.00).[4] Plaintiff bases this calculus on Section 15.1(e) of the Master Lease and seeks total damages in the amount of $1,831,644.45.

### 2. Section 15.1(e) of the Master Lease is Substantively Unconscionable

Under Arizona law, "[s]ubstantive unconscionability concerns the actual terms of the contract and examines the relative fairness of the obligations assumed." *Maxwell v. Fid. Fin. Services, Inc.*, 184 Ariz. 82, 89 (1995) (in banc) (citations omitted). "Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." *Id.* (citation omitted). "[A] claim of unconscionability can be established with a showing of substantive unconscionability alone, especially in cases involving either price-cost disparity or limitation of remedies." *Id.* Unconscionability can arise from "grossly-excessive price" and from "apparent injustice and oppression in [contract] provisions." *Id.* at 90-91. "The determination of unconscionability is to be made by the court as a matter of law."

---

[3] Defendants challenge the validity of these figures. Those arguments can be set aside because the Court severs these damages by virtue of their substantive unconscionability.

[4] To elaborate, Plaintiff argues—and Defendants do not dispute—that Plaintiff is entitled to $1,223,993.84 under the Stipulated Loss Value Schedule, minus the proceeds of a commercially reasonable sale of the Equipment. Plaintiff reports that it received $320,000 for that sale. Defendants challenge Plaintiff's assertion that Plaintiff disposed of the Equipment in a commercially reasonable manner and in good faith, relying in part on the affidavit of an expert, Tom Amenta, who explains that $617,930.00 would more accurately state the applicable fair market value at the time of the sale. Plaintiff disputes Amenta's expert credentials and adds that it is willing to stipulate to a sale value of $617,930.00 to avoid any genuine dispute over this admittedly material fact. The Court holds Plaintiff to that stipulation.

*Regatta Point Condo. Ass'n v. Regatta Point, LLC*, 1 CA-CV 06-0403, 2007 WL 5446676, at *5 (Ariz. Ct. App. Dec. 11, 2007).

The Master Lease provides for two principal kinds of damages: liquidated damages pursuant to a stipulated loss value schedule and damages for all unpaid rent payments. Taken together, these damages provisions are manifestly unjust.

In the ordinary course, Plaintiff would be entitled only to expectation damages—the default remedy in contract law. Accordingly, if the Master Lease had been completed without breach, at the end of performance of the contract Plaintiff would have received (a) all the rent payments and (b) the Equipment, the resale value of which would have decreased by some amount since the initial lease. Plaintiff would not be entitled at the end of the contractual arrangement to some additional payment for any drop in the value of the Equipment; presumably, if Plaintiff acted rationally, anticipated capital depreciation would have been priced into the monthly rent payments. The Master Lease, however, provides that in the event of a breach, Plaintiff gets both (a) all future, unpaid rent payments and (b) a sum of money that reflects that anticipated sale value of the Equipment, minus proceeds of an actual sale.

This arrangement immediately triggers two alarms. First, because Plaintiff undertakes to sell the Equipment upon a breach, the contract renders mitigation impossible and thereby leaves Defendants stuck with all unpaid rent payments. Second, Plaintiff is reimbursed for capital depreciation only in the event of breach. Given that contracts are ordinarily written with the expectation of complete performance, it would be very surprising if Plaintiff had not also accounted for capital depreciation in the rent payments. Damages comprising an independent sum for capital depreciation *and* future rent payments would impermissibly "double-dip."

More troubling, however, is the duplicative nature of the liquidated damages provision and the provision imposing damages for unpaid rent. On the one hand, Plaintiff demands rent payments stretching into the future after the moment of breach. On the other hand, Plaintiff (by hypothesis) sells the machine at the moment of breach. And not only does Plaintiff get the proceeds of that sale, but Plaintiff also gets an additional amount reflecting the difference between those proceeds and the anticipated sale value at that moment in time. So Plaintiff gets all future rent payments on the Equipment, all proceeds of a sale of the Equipment, and an amount designed to compensate Plaintiff for any drop in the value of the Equipment.

Simply put, this is the very definition of an unconscionable arrangement. Plaintiff simultaneously profits by selling the machine *and* profits by receiving future rent payments on a machine that—by virtue of the contractually mandated sale—it no longer owns. The manifest injustice of this bargain squarely implicates substantive unconscionability and hints at procedural unconscionability in the bargaining process for this contract.

### 3. Applying the Severability Clause To the Damages Clause

In light of the Court's conclusion that Section 15.1(e) is unconscionable and therefore cannot be enforced, the severability provision is triggered. Accounting for the course of events in this case—including the fact that Plaintiff actually sold the Equipment—and the relevant provisions of the Master Lease, the Court concludes that the appropriate damages provisions to sever are those that authorize unpaid rent payments, property taxes, and late charges. By enriching Plaintiff even after Plaintiff has actually—and, for purposes of the stipulated loss value schedule, by hypothesis—sold the Equipment, these damages are manifestly unjust and therefore void as against public policy. This leaves only the liquidated damages provision, the total dollar figure for which represents the parties' best *ex ante* approximation of the sale value of the

Equipment at the point of breach. Here, that figure—and the parties do not dispute this point—is $1,223,993.84. Plaintiff, however, has already received $617,930.00 from a commercially reasonable sale of the Equipment. The Court subtracts this amount from the total damages to which Plaintiff is entitled and awards Plaintiff damages in the total amount of $606,063.84.[5]

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED. The Clerk of Court is directed to enter judgment in favor of Plaintiff and against Defendants in the amount of $606,063.84.

The Clerk of Court is directed to close the motions at Dkt. Nos. 47, 54 & 57, and to close this case.

SO ORDERED.

Dated: New York, New York
       March 29, 2013

_____
J. PAUL OETKEN
United States District Judge

---

[5] Defendants argue that the liquidated damages provisions function as an unenforceable penalty clause. Most of these arguments hinge on the duplicative nature of the liquidated damages and other damages. However, the appropriate response is to invalidate the impermissible provisions, not to artificially deem the liquidated damages clause a "penalty"—which it most assuredly is not, since "the amount fixed in the contract must be a reasonable forecast of just compensation for the harm that is caused by the breach" and "the harm that is caused by any breach must be one that is incapable or very difficult of accurate estimation." *See Larson-Hegstrom & Associates, Inc. v. Jeffries*, 145 Ariz. 329, 333 (Ct. App. 1985).